# STATE OF MICHIGAN

# COURT OF APPEALS

STATE TREASURER,

Plaintiff-Appellee,

v

CHANTAZ M. SWOOPE, ALVENA A.
SWOOPE, GLIDERS, INC., and REBIRTH
MENTORING,

Defendants-Appellants.

UNPUBLISHED
August 30, 2016

No. 326861
Wayne Circuit Court
LC No. 14-008381-CZ

Before: BECKERING, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendants appeal as of right a final order regarding reimbursement of prisoner expenses pursuant to the State Correctional Facility Reimbursement Act (SCFRA), MCL 800.401 *et seq*. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant Chantaz M. Swoope was previously convicted in Wayne Circuit Court of assault with intent to do great bodily harm less than murder, MCL 750.84, and possession of a firearm during the commission of a felony, MCL 750.227b. Because of these convictions, Chantaz was sentenced to two years' imprisonment on October 31, 2013. On June 27, 2014, the attorney general filed a complaint in Wayne Circuit Court, alleging that Chantaz had sufficient assets to reimburse the state for the anticipated costs it would incur during the term of his incarceration. In addition to the unusually large funds deposited into his prison account, the attorney general alleged that Chantaz had an interest in the businesses he operated with his wife, Alvena A. Swoope, including Gliders, Inc., (Gliders), a for-profit bus charter service. Along with its complaint, the attorney general filed a motion requesting a show-cause order and ex parte order appointing a receiver for Chantaz's assets pending a resolution of the action. On July 1, 2014, the court granted the attorney general's motion and entered an order requiring Chantaz to appear before the court to show cause why an order should not be entered appropriating his assets for reimbursement of the costs of his incarceration. The order also appointed Alvena as a receiver over her husband's assets and business interests during the pendency of the case. The order required Alvena to provide the court with a full and complete accounting of all of her husband's assets, "including, but not limited to, income from the businesses Rebirth Mentoring,

-1-

Gliders, Inc., and Chantaz Contracting, as well as their financial account locations, balances, account numbers, addresses, legal descriptions and valuations of any real estate holdings."

On November 14, 2014, the trial court held a hearing on defendants' emergency motion to quash subpoenas. Seeking to prohibit discovery of her or Gliders' financial information, Alvena testified at the hearing that Chantaz had no ownership interest in Gliders. She submitted an affidavit identifying herself as the "founder, President and CEO of Gliders Inc" and contending that Chantaz "is not and never has had an ownership interest nor has he ever been an employee of Gliders Inc. and has and does not derive an income from the company." She further averred that she and her husband kept their financial affairs separate, that his own businesses had no assets, and that all Chantaz owned was two motorcycles, a few vehicles, a bank account with around $180, and a joint interest in the marital home. Documentary evidence contradicted Alvena's assertion that Chantaz had no interest in Gliders. Specifically, Gliders' federal tax returns for the years 2012 and 2013 identified Chantaz as owning 50 percent of the company, with Alvena owning the other 50 percent. Gliders' website identified the company as a "family-owned transportation service, an enterprise initially pursued by Mr. and Mrs. Swoope who runs the daily operations together. Both are customer-focused, friendly, and have a passion for excellence . . . ." And on Chantaz's LinkedIn page, he identified himself as co-president of the company. Alvena maintained that her husband had no existing ownership or role in Gliders, but she admitted that tax filings and the website showed otherwise. In light of the documentary evidence, the trial court found that Chantaz had a 50 percent interest in Gliders and denied defendants' motion to quash.

On November 21, 2014, the attorney general filed a brief regarding the upcoming show-cause hearing. In its brief, the attorney general stated that the cost of Chantaz's two-year incarceration would be $57,760. The attorney general opined that, despite various orders to do so, the Swoopes still had not made a full disclosure of Chantaz's assets, though the limited disclosure already established that he had sufficient assets to pay the full cost of his incarceration. Although tax returns from Gliders showed that it was operating at a loss during 2012 and 2013, the activity in its bank accounts at Bank of America and Comerica demonstrated otherwise. According to the attorney general, the Swoopes' continued refusal to fully account for Chantaz's assets, coupled with significant and unexplained cash withdrawals and transfers shown in defendants' bank accounts, created a reasonable inference that defendants were deliberately hiding assets in violation of MCL 800.403a(1)[1] and the court's previous orders.

At the show-cause hearing held on November 26, 2014, the attorney general produced bank records for Gliders and again brought to the court's attention what it deemed to be questionable recent cash withdrawals from the business's bank accounts, as well as significant transfers of money to an undisclosed checking account. According to the attorney general, there was more than $134,000 in questionable transactions that appeared to demonstrate asset hiding. Further, documentation showed that Chantaz was receiving an average of over $700 a month in

---

[1] "A prisoner shall fully cooperate with the state by providing complete financial information for purposes under this act." MCL 800.403a(1).

prison phone credit from Gliders, which the attorney general argued supported a reasonable inference that he was conducting business through these telephone calls. Although defendants' individual tax information was requested, neither Chantaz nor Alvena had filed individual tax returns with the state of Michigan in three years. At no time during the hearing did defendants raise an issue regarding whether Chantaz had any legal or moral obligations to support any dependents. Instead, the only evidence presented to the court by defendants portrayed Chantaz as insolvent and not in a position to contribute anything to anyone. The trial court found that Chantaz had sufficient assets to reimburse the state for the full $57,760 cost of his incarceration.

During the hearing, the court learned that Chantaz had been using his own money to purchase food from the prison commissary because the food served by the prison made him ill. The court opined that if Chantaz was unable to avail himself of the food provided by the prison, the money he spent on purchasing his own food should be deducted from the amount he owed. On December 1, 2014, the court entered an order requiring Chantaz to request accommodation of his dietary needs within one week, and indicated that Chantaz's reimbursement obligation would not be reduced if the prison provided appropriate meals within 20 days of his request. Although the parties dispute the timing of Chantaz's request for accommodation, he ultimately began receiving a therapeutic diet on January 8, 2015.

At a hearing held on March 20, 2015 regarding entry of a final order, defense counsel advised the court that only one issue remained. Specifically, defense counsel took umbrage with the insertion in the attorney general's proposed order that defendants pay the amount ordered within 30 days. The court agreed that it had not ordered payment within 30 days. The trial court ruled that defendants had six months to reimburse the state for Chantaz's incarceration expenses and entered its final order to that effect.

II. ANALYSIS

On appeal, defendants argue that the trial court erred because MCL 800.404(5) required the court to take into consideration Chantaz's legal and moral obligations to support his spouse and minor children before entering an order for reimbursement under SCFRA, and it did not do so. By contrast, the attorney general argues that there was nothing for the trial court to consider because defendant never contended that he had any such obligations.

"Generally, an issue is not properly preserved if it is not raised before, and addressed and decided by, the trial court." *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). In this case, the record does not clearly show that this issue was raised in the trial court. The attorney general attached to its brief on appeal a "Motion to Show Cause Pursuant to MCL 800.404 to January 15, 2015 Order for Response," which it indicates it received in the mail from Chantaz on January 21, 2015. According to Chantaz's representations in the brief, he mailed a copy of the brief to the attorney general, the court, and his wife. The attorney general then sent a copy to defendants' counsel. In the brief, Chantaz points out the requirements of MCL 800.404(5) and criticizes the attorney general for not soliciting from him any information regarding his support obligations. The brief requests that the court "order the Defendant's [sic] to supply this Court with a detailed list of all legal obligations, including moral obligations as well. Without a detailed ledger of commitments and moral obligations this Court can not make a legal determination as to the Defendant's ability to pay for the cost of his

incarceration." In the brief, Chantaz also asks the trial court to "order the Defendants to have a certified public accountant prepare past and present business and personal tax returns for the past three years including the 2014 year so this Court can consider whether the Defendant even has the ability to pay for his incarceration." In other words, Chantaz asked the trial court to order him to produce information regarding his support obligations.

The register of actions does not reflect that Chantaz's *in propria persona* brief was filed with the trial court. And there is no other indication in the record that the trial court ever received or reviewed Chantaz's brief. Defendants do not mention the brief on appeal. Notably, defendants' attorney did not mention the brief or argue the support issue at the March 20, 2015 hearing regarding entry of a final order. Instead, he proclaimed that the only issue left to decide was the timing of payment, effectively abandoning any claim that there were support obligations for the trial court to consider. As such, we conclude that because the issue was not "raised, addressed, and decided" by the trial court, it is unpreserved for appellate review. *Mouzon v Achievable Visions*, 308 Mich App 415, 419; 864 NW2d 606 (2014) (quotation marks and citation omitted).

"This Court will generally decline to address unpreserved issues unless a miscarriage of justice will result from a failure to pass on them, . . . the question is one of law and all the facts necessary for its resolution have been presented, or [it is] necessary for a proper determination of the case." *Autodie, LLC v City of Grand Rapids*, 305 Mich App 423, 431; 852 NW2d 650 (2014) (quotation marks and citation omitted). We will address the issue because the necessary facts have been presented. However, our review is limited to plain error affecting substantial rights. *Kern v. Blethen–Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000). "To avoid forfeiture under the plain-error rule, three requirements must be met: (1) an error must have occurred; (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *Id*. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1; 9; 761 NW2d 253 (2008).

The SCFRA provides a mechanism by which the attorney general may seek reimbursement of the expenses incurred by the state for the cost of a prisoner's incarceration. See MCL 800.404. When the attorney general files a complaint pursuant to MCL 800.404(1), the circuit court must issue an order directing the defendant-prisoner to appear before the court and show cause why his assets should not be appropriated for purposes of satisfying his SCFRA reimbursement obligations. MCL 800.404(2). The statutory language at issue in this matter relates to the show-cause hearing and provides:

> At the hearing on the complaint and order and before entering any order on behalf of the state against the defendant, the court shall take into consideration any legal obligation of the defendant to support a spouse, minor children, or other dependents and any moral obligation to support dependents to whom the defendant is providing or has in fact provided support. [MCL 800.404(5).]

"The word 'shall' is unambiguous and is used to denote mandatory, rather than discretionary, action." *STC, Inc v Dep't of Treasury*, 257 Mich App 528, 537; 669 NW2d 594 (2003). Defendants contend that the trial court failed to comply with the statute because at the show cause hearing, "any discussion of Mr. Swoop's personal moral obligations of support were

-4-

notably and unjustifiably absent," and were "similarly overlooked in the records of all appearances the defendants made in this matter. . . ." The attorney general argues that the trial court did not run afoul of the statute because there was no evidence of such support obligations for the trial court to consider, and that the statute does not require the trial court to inquire into something about which it was not made aware by the defendant.

In *State Treasurer v Downer*, 199 Mich App 447, 448; 502 NW2d 704 (1993), this Court reversed a trial court's reimbursement order because it was revealed during the show cause hearing that the defendant had a wife, daughter, and several stepchildren that he had supported or wished to support. The defendant wanted to subpoena these people in order to establish his support obligations, but the trial court denied his request, stating, "I agree that you have other people that need your money and need your support, but the State of Michigan got there first." *Id*. In reversing the trial court, this Court held as follows:

> The mandatory language of subsection 4(5) requires a trial court to "take into consideration" a defendant's legal or moral obligations before entering an order against a defendant. While the statute's requirement is admittedly nebulous, there is no indication in the record before us that any consideration whatsoever was given to defendant's alleged obligations. [*Id*. at 448-449.]

*Downer* stands for the proposition that a trial court cannot refuse to take into consideration a prisoner's support obligations. It does not speak to the issue at hand, being whether the trial court has a duty to inquire whether such obligations exist in the absence of record evidence or allegations of same by the defendant. Moreover, it can be distinguished from the instant case because, unlike *Downer*, there is no record evidence that Chantaz owed any legal or moral obligations of support to dependents or that he asked the court to allow or assist him in collecting and presenting such information.

Chantaz made no mention of any support obligations in any documents of record or at any of the hearings held in this matter, and his counsel never raised the issue, including at the March 20, 2015 hearing regarding entry of the final order, a point in time after he had received a copy of Chantaz's *in propria persona* brief. Rather, defendants chose to portray Alvena as completely independent of Chantaz in her business affairs and to depict Chantaz as essentially insolvent. On appeal, defendants have produced no evidence to establish whether Chantaz actually has any legal or moral support obligations. Hence, even if we were to agree with defendants that MCL 800.404(2) obligates a trial court to inquire of a defendant whether any support obligations exist in order to take them into consideration, defendants have not established that such an inquiry by the trial court in this case would have altered the outcome, and thus, affected his substantial rights.

The evidence of record strongly suggests that Chantaz had access to assets sufficient to fulfill both his statutory obligation to reimburse the state as well as any financial or moral obligation to provide adequate support for his family. The record does not indicate, nor does Chantaz argue on appeal, that his family was without adequate support during his incarceration. As described above, what the record shows is that Gliders generated substantial amounts of cash and that, during Chantaz's incarceration, the company showed cash withdrawals, transfers between bank accounts, and questionable checks totaling over $134,000. In addition, Gliders

provided Chantaz with an average of $700 per month in prison phone credit and more than $1,000 for food packages, while Alvena herself transferred an average of $500 per month into Chantaz's prison account. Thus, the record indicates that, not only did Gliders generate sufficient cash to maintain operations and Chantaz's family, but also to amass considerable cash assets and to provide Chantaz with at least $1,000 per month in prison credit.

In light of the foregoing, we conclude that, even if the trial court plainly erred by not inquiring into and expressly considering Chantaz's family support obligations in accordance with MCL 800.404(5), it is clear from the record that consideration of any such obligations would not have produced a different outcome. *Utrera*, 281 Mich App at 9. Because defendants have not shown prejudice from any violation of MCL 800.404(5), we affirm the trial court's order requiring defendants to reimburse the state $57,760 for the costs of Chantaz's incarceration.

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola